Good morning. Your Honor, may it please the Court, Ashfaq Chaudhry on behalf of Appellant Brian Flewell. I'd like to try to reserve two minutes for rebuttal. Got it. I will try to do that. Your Honors, we raised three issues in our brief and I'd like to start working backwards. So I'd like to start with the consent to search issue. Now, I think the crucial point here on the consent to search, the government is very candid about what happened here. The agents came in with a plan to engage in subterfuge or a ruse. And that's actually one of the things that's pretty distinctive about this case. As the Court is well aware, looking at the case law, this is not just one or two statements. This is a long and extended two-hour subterfuge. Counsel, are you aware of a case that precludes police from using subterfuge in the process of interviewing a suspect? Your Honor, it is true that subterfuge can be used. It's true. Now, we have the voluntariness arguments and the Miranda issue, the custodial interrogation issue. And I'll say two things to Your Honor's question. Subterfuge can be used, but our point is on to the voluntariness point. It can become a problem when it robs the suspect of the ability to make an informed and voluntary decision. And there are cases where the subterfuge or the deception is perhaps a statement about some of the evidence, perhaps a fingerprint was found here or something like that. But the cases make a distinction, and the government also makes this distinction, between factual misrepresentations and legal misrepresentations. So are you saying there was a legal misrepresentation? Well, I would say that the entire nature and purpose of the interview here was a deception. The entire nature of the interview, the entire presentation about what the interview was about, the interrogation was about, what the purposes of the interrogation were for, what mattered and what didn't matter, what the agent said they cared about, what they didn't care about, that was all misrepresented. So I think it's slightly different. What was the legal misrepresentation in there? That the police told Mr. Flewell a number of times, for example, at ER 139, we're not here to look into your tax returns or anything. Is that a legal misrepresentation? Well, I think it gets to the point of suggesting that certain things they're not going to care about. They're there, as I said, to investigate threats to the president. It's a factual misrepresentation. Well, Your Honor, they'll- Well, whatever it is, is there anything wrong with telling them that? I mean, they can tell them they're looking for aliens from outer space. I mean, you know, is there any case that says they can't do this kind of ruse, however you characterize it? Your Honor, I would point out that in terms of the custodial interrogation point, and I'll get back to the consent to search, this court in Buran and the Eighth Circuit in Griffin and the Seventh Circuit in Sprosty all point out that deception or subterfuge is a relevant factor. And when I get to the custodial interrogation, I can talk more about how that fits in, but that comes directly out of Miranda. The factors, the indicia of custody that Buran, that Griffin, that Sprosty lay out include deception or deceptive interrogation tactics because that was one of the police tactics discussed at length in the Miranda opinion. And that was one of the things that Miranda was meant to protect against. And I think that's where that comes from in the interrogation. Now, in terms of the voluntariness of the statement and the consent, I think the Lahl case we point to, and even the, I'm going to mispronounce it, the Oro-Gage case, talk about when the police mislead the suspect about the nature of their rights, about the nature of their right to remain silent or not incriminate themselves. Now, those are legal. Those would be legal issues, right? Yes, Your Honor, and I would argue that here, first of all, Mr. Flewell was never ever told that he had a right not to speak to the police or that he had a right to terminate. That, I think, is important, crucial. That's a factor. That's crucial, and I think it's important if you look at the government's authorities. I think almost every single authority they cite, there's something to the, there's a statement or advisory to the effect of you're free to leave, you're not under arrest, or you're free to talk to a lawyer. I think we go through that in a reply brief, and that's including the voluntariness cases, and this Court has emphasized again and again in the voluntariness context in the Crawford case, in the Miller case, the importance of that advisement. That has been pointed out as possibly the most significant factor, and we point that out in Griffin. But isn't the real test whether a reasonable person would feel like they had the opportunity to leave or to terminate the discussion? That's correct, Your Honor, and it is a reasonable person test, a totality of the circumstances test. So I'll just address it now. The deception point, I will agree, does not fit into that reasonable person test very neatly, and I think the reasonable person test is a test that's developed over time as a way to try to give some guidance and figure out how are we going to determine when someone should get these Miranda warnings. And the interesting question here, I think it is a very interesting question here, is whether the government's theory that if we lie to you about why we're there, that sets you at ease and that's okay. And I think that's, I would say, a point that the government has not cited authority directly on point for. And I don't think there is a case in this circuit saying or considering that point as to the custodial interrogation point, whether if you lie to the defendant about the purposes, about the ramifications of the interrogation, then that gets you out of custodial interrogation. I would point out on that point, we discuss extensively Beran v. Penes, where there was deception using the court, went through the factors. And I think that case is actually very similar to ours. It's striking to me that the government does not make any attempt to distinguish that case,  where the court laid out as one of the factors, subterfuge, a relevant factor. And that case, also very similar to our case, is an in-home interrogation that was found to be custodial. Now, those cases lay out and make clear that this court, other courts, take into account deception as a relevant factor for custodial interrogation. And while it does not fit directly into the reasonable person test, I would argue it does fit into the totality of the circumstances test, and that all that test comes from, and I think it's important to go back to where we started on this road, Miranda. And these indicia come directly out of Miranda. We cite the description of the police tactics and quote it in our brief about what Miranda was concerned with. And it fits this case to a tee. Isolation, lengthy interrogation, et cetera. You mentioned you wanted to reserve two minutes, and you're down to a minute and 45. Okay, I'll just take 45 seconds to make my points very quickly, and I'll reserve the minute. On the consent to search, I would just say this. It's clear that a consent to search cannot be obtained through, I believe the cases show, through this type of trickery and deceit. And this consent to search was obtained in the midst of the deceit. There's no dispute about that. At this point, when the consent was obtained, it was at, this is around the two-hour mark, ER 167, 168. And it's just demonstrative that right after that, the next page, 169, the police say, amongst other things that you've described over here, do you have any ideas, other things we might know about that concerns this? And Mr. Flula says, in regards to that, I don't know anything about threats to anybody. He's still completely under the spell of the deception.  Thank you. Thank you. May it please the Court. Joshua Robbins to the United States. Good morning. Good morning. I'll actually just open briefly with the last point that Mr. Chaudhary raised, which has to do with the consent. He's missing an important point, which is that the consent, well, the search didn't take place until towards the end of the encounter. And the defendant had not only agreed to consent earlier on orally, and he consented in writing later on. The written consent form was extremely specific about what he was consenting to, his right not to consent, the fact that the items that were going to be seized were contraband, specifically they wrote out child pornography, and that the items that were seized could be used against him in court. And not only that, in the written statement that he provided after being given Miranda warnings, he specifically stated twice explicitly that he had consented to the officers searching the computer and taking items, the illegal items on there, specifically he wrote out child pornography. The Miranda warnings were a bit late in the process. Would you agree? Well, the Miranda warnings, I don't agree that they were late for purposes of Miranda because he wasn't in custody. You said as a factual matter. Oh, they were towards the end of the encounter, certainly true. So why do you think the officers gave them a Miranda warning towards the end of the encounter as opposed to in the beginning of the encounter? Not really clear, Your Honor. Sometimes I think officers do that just as a sort of belt and suspenders approach, I think. I mean, clearly they had recorded the entire interview. Clearly the purpose of the interview was to get statements, incriminating statements on the recording that could be used as evidence. And if they had believed it to be custodial or intended it to be custodial, they would have done the Miranda warning earlier. It can't be said that the Miranda statements that were given were designed to sort of retroactively validate what had happened before. I think that the specific language that the officer used when he asked him to sign the Miranda form was just write out something generic. So the several sentence statement that was put in down after the Miranda warnings was not the purpose of the entire interview or encounter, so it can't be argued that there is like a two-step problem here. The two-step issue only arises when the officers have deliberately asked a bunch of questions, and then the real purpose is to then Mirandize him and get statements after that. If we were to determine that the encounter was custodial from the beginning, you would have that problem, wouldn't you? No, not unless, with respect to the written statement? Yes. No, not unless you determine that the officers had done the first three or three and a half hours of the interview specifically to get this written statement after the Miranda forms. Right. That would be the test. I certainly don't think that's. So if we were to determine that the interrogation was custodial and that the purpose of the officers was to get an incriminating statement, and then they gave the Miranda warning, wouldn't you have that problem? No. It would only be if the purpose was to get him to waive Miranda rights later on and then make what they intended to be used as the evidence, as the evidentiary statement, and that the entire lead-up to that was just to get him to make that statement. That would be the test. Just to make the written statement, that's your argument? If they didn't intend to get the verbal statements? If they intended the verbal, if they didn't intend to get the verbal, you would have to find that they didn't really intend to get the verbal statements in as evidence, that it was all just a setup to get him to make this written statement. That is how Missouri v. Siebert reads and works, and that's how the test would work. And I certainly don't think the facts suggest that at all. I think it's pretty clear that they recorded all the earlier statements because they intended that. And they were much more specific and detailed about how he used the computer, where the items were on the computer, that he knew that the items were there. But those would be thrown out if we determined it was a custodial interrogation because there were no Miranda warnings given for that. Correct, and that's my point. They would be, and that's why the officers, it can't be suggested that the officers were only trying to use those as a setup to get this written statement because that's what Missouri v. Siebert, the two-step approach would be. But, yes, certainly if the earlier statements were made in custody and he wasn't Mirandized, yes, then that's a Miranda violation, no question about that. On the deception point, the counsel has suggested in his reply brief, and I think again here today, that the government is somehow making a novel argument and going out on a limb with the suggestion. But if we've gone out on a limb, it's a fairly sturdy limb because the Supreme Court and this court and other courts are all out here with us. And the cases in particular at site are U.S. v. Crawford, which we cited quite a bit in our brief, Oregon v. Mathiasen, which is a Supreme Court decision that's cited in Crawford, U.S. v. Cotney, which is also cited in Crawford, that's a Seventh Circuit decision by Judge Posner, and Illinois v. Perkins, which we cited in our 28-J letter. And Crawford in particular was similar to this case in that the police in that case, as this court sitting on bonk specifically said, the police lied to the suspect and said that, indicated that they were only interested in interacting with him to find out whether he had complied with the terms of his parole, when in fact he was the primary suspect in a bank robbery investigation that they were conducting. And that's the reason they wanted to interact with him. So the entire encounter was a ruse. Mr. Robbins, in the appellant brief, it's argued at page 35 that the agents repeatedly told Mr. Flewell that the burden was on him to prove that he wasn't molesting children, thus suggesting that they weren't about to leave until he had somehow satisfied this burden of proof. Why isn't that kind of deceit the type of coercion that really forced a confession in this case? Well, I don't think that they've argued that that was deceit. They argued, and I should say the initial argument before the district court was about coercion. This argument about deception as being relevant to Miranda and custody didn't come out until really the reply brief. As to the specific question about whether that was coercion, well, their characterization of that, I think, is advocacy. That's not quite what took place. There was a brief interlude a little bit after two hours, after he had already confessed to having child pornography. There was a brief interlude where he actually volunteered information that he had possessed items of children's clothing, which is not something that they knew or expected. It's not something that they had tried to elicit from him. They had no idea that that was the case. And when he said that, their reaction was a bit alarmed, and they wanted to know if there was more information about whether there were contact offenses with children. But they certainly didn't say, we're not going to leave here until you tell us that. They said, we'd like information. Can you tell us information that we can go check out and see whether or not there were such offenses? And even after that, they made additional statements indicating that they were going to be leaving, and if he had anything else to say to them about that, he should tell them at that time, because they didn't want to have to come back up from Los Angeles to interview him again. And then they made the arrangements for him to go travel on his own to do the polygraph and so on. In Bassignani, which is a decision of this court involving a child pornography case and a Miranda or custody issue, there was also a brief period of confrontation, as this court said, in which I believe the officer in that case told the suspect, we have your e-mails connecting you to the illegal images, it's a done deal. And there were a couple other things that happened that were somewhat confrontational. But what this court said was that a brief confrontational moment in an otherwise non-confrontational interview does not convert that interview into a custodial one. And I think that's certainly true here. So I think based on the entirety of the interview, and I think not just the words but the tone, that shouldn't be taken out of context or mischaracterized, which is somewhat what I think they did with their opening brief on that passage. Obviously, you have the transcript and, more importantly, the recording, so you can see what exactly was said. I wanted to also mention Oregon v. Mathiasen. That was a case in which the U.S. Supreme Court 7-1 said that whether a suspect is misled, in that case the misleading was falsely telling him his fingerprints had been found at the crime scene, has nothing to do, in the words of the Supreme Court, nothing to do with whether he is in custody. And I think the reason for that is the one that you mentioned at the beginning, Judge Tunheim, which is that the test is an objective one. It's whether the person in that position would reasonably believe they were not free to leave. It has nothing to do, as the Supreme Court has said so in Stansbury v. California and in many cases, has nothing to do with what is in the agent's heads, whether they believe that the suspect is a suspect, whether they intend to arrest him. And as this Court has said a number of times, or the Supreme Court has said, whether they intend to mislead him. That's just a settled law and it's a matter of logic. If a person doesn't believe that they're a suspect, why would they think that they're under arrest? That's a question that I just don't think the defense has attempted to answer in this case. Perhaps they might do so now. Counsel, what's your response to opposing counsel's observation that the cases you rely upon all involve the fact situation that the suspect was told he was free to leave and would not be arrested? Well, first of all, it's not quite true. In Bassignani, he was told that he was not under arrest, but he was not told he was free to leave. In fact, he was told, you'll be walking out when this is done, which I think would imply that he had to be there. He had been instructed to come to the room and talk to the officer. He'd been taken into the room, and he was told, you'll walk out when you're done. But to me, that suggests not until you're done. In Hughes, also, the suspect was told he was not under arrest, but he was not told that he was free to leave. Red Lightning, he's tried to distinguish Red Lightning because that was not actually a Miranda case, but it was a case involving a question about whether the person was in custody for Fourth Amendment purposes, which is the same test. And in that case, he was not told that he was free to leave, even though he was given Miranda warnings. And the last point on that, I'd say, even in Craighead itself, it said the test is not whether a person is told, it's whether he would have felt that he was free to leave. And when the officers, as they did in this case, asked for permission to come in, asked for permission to speak with him, asked whether he had time or other plans, that certainly signals to a person and indicated that he was not a particular suspect, at least at the beginning of the interview. That signals to a person that he's not under arrest, and that's more powerful than stating so. And with that, I would submit. Questions? Thank you very much, Mr. Trotter. Mr. Trotter, you've got, we'll put a minute on the clock. Would you please keep it to a minute? I will try. Thank you, Your Honor. No, not try. I will. Thank you very much, Your Honor. Okay. I'll speak very quickly. I'll point out one thing. The mask dropped here. So in terms of the ruse, two hours, the mask dropped. So I think that is a relevant factor. After that, it's clear from the transcript, it became much more confrontational. In terms of the questions the Court was asking about the burden on Mr. Fulwell that the agents put, I would just refer to ER 175, 176, and 185. The language is actually proving this is your time to be able to prove, et cetera. It's in the transcript. I think it's pretty clear. In terms of the, whether telling Mr. Fulwell he was not under arrest or telling Ms. Reed to leave, I think our point is that all the cases to say either you're not under arrest or you're free to leave or you can talk to a lawyer. I think you'll see that, and that's clear from the papers. And I think it's remarkable here that even within the ruse in the first two hours, Mr. Fulwell was not told that, which is incredible. If the ruse is you're here to help, you're here to help with an investigation to threats to the President, it's amazing that didn't happen. My final point is below the government argued that this would be a dangerous result if our position won out. I actually think you'd make things difficult for law enforcement. I actually think the government's position makes things difficult for law enforcement. What is the message that we take away if the government prevails? That if the police come to your door, you need help with cooperation and investigation. Well, actually, the police asked him if they could come in. All he had to say was no at that point. It was his home. Someone was asking him to come into his home, and he had the right to say no, you can't come in. Yes, Your Honor. And I would just point out, I think the record is clear that Mr. Fulwell did try to ask a number of times, how can I help you, how can I help you? The police kind of refused to answer that and kind of settled in before they started on their lengthy subterfuge. And I would just point out that the police need the public to cooperate. The message that the government's position would be here is that if the police come and ask you for your cooperation, you should be wary, you should be suspicious. And I think that would actually make things difficult. If a police comes to our door and say, may I come in? You have the right to be wary and say no, you can't come in. Yes, Your Honor. My point only is that there are situations where the police will need to talk to people in the neighborhood or area, try to get their help. And I think this result, if the government prevails, would possibly make that more difficult. Thank you, gentlemen. The case just argued is submitted. Good morning. Thank you very much. The next two cases, Johnson v. Schwartz,
judges: Tunheim, Silverman, Rawlinson